**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Glenn Tinney, | ) | CASE NO. 1:14 CV 703 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Richland County, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

**<u>Introduction</u>**

This matter is before the Court upon Defendants Richland County, Ohio, Joseph Masi, James Mayer, Jr., and David Mesaros' Motion for Judgment on the Pleadings (Doc. 26).[1]  For the following reasons, defendants' motion is GRANTED IN PART and DENIED IN PART.

**<u>Facts</u>**

---

[1]     Defendants' request to delete the word "Partial" from the caption of this motion was granted on November 13, 2014.  Following James M. Mayer, Jr.'s death, on December 8, 2014, the Court dismissed the majority of the individual capacity claims brought against him because they did not survive his death.  James M. Mayer, III was substituted as the defendant for the state claims of infliction of emotional distress and civil conspiracy which did survive.  However, for ease of reference, James M. Mayer, Jr. is referred to as a defendant in this Opinion.

Plaintiff, Glenn Tinney, brings this action against Richland County, James M. Mayer, Jr. ("Mayer"), Joesph Masi ("Masi"), David Mesaros ("Mesaros"), and several unnamed defendants.

The following facts are set forth in the pleadings.  Ted White ("White") was robbed and clubbed on the head at his mattress business in the early afternoon of August 11, 1988 in Mansfield, Ohio in Richland County. (Comp. ¶ 16).  There was no evidence of a robbery.  The cash register had not been tampered with and still contained money, White's wallet was on his person, and his jewelry was in the store. (Comp. ¶ 38).  White died three days later before giving a statement to the police.  (Comp. ¶ 17).  There were no fingerprints, DNA evidence, or witnesses.  (Comp. ¶ 17).  For four years, the case remained unsolved.

In 1988, James Mayer, Jr. ran for prosecutor in Richland County on a pledge to solve unsolved crimes.  (Comp. ¶ 18).  After he was elected, Mayer hired Masi as a prosecutor's investigator and gave him a special assignment to investigate stale cases. (Comp. ¶ 19).  While running for re-election in 1992, Mayer asked Mansfield's police department to give him the name of five unsolved homicides. (Comp. ¶ 20).  Whites's name was included on the list.  (Comp. ¶ 20).

Around that time, Richland County prosecutor's office received a tip that a man named Matt Mason ("Mason"), who was also being investigated in another murder case, may have been involved in assaulting a man at a waterbed store.  (Comp. ¶ 22).  As part of the investigation into Mason, Masi interviewed plaintiff, who was in prison serving a sentence for an unrelated burglary.  (Comp. ¶ 23).

At that time, plaintiff was suffering from severe mental illnesses not controlled by

2

medication.  (Comp. ¶ 25).  Specifically, plaintiff was diagnosed as paranoid, schizophrenic, depressed, and antisocial. (Comp. ¶ 25).  He suffered from delusions and hallucinations and other psychotic features that made him unable to discern fact from fiction.  (Comp. ¶ 25). While plaintiff had been prescribed a strong anti-psychotic medication, he would often not take it and his illnesses were not well-controlled. (Comp. ¶ 26).

Initially, during his first interview with Masi, plaintiff said he had nothing to do with White's death.  (Comp. ¶ 29).  Plaintiff then began to change course and told Masi "if you want to pin the murder on me, that's just fine." (Comp. ¶ 30).  Plaintiff's mental illnesses would have been immediately obvious to anyone interacting with him. (Comp. ¶ 27).  Plaintiff offered to provide information to defendants in exchange for approximately $250 he claimed was owed to him by the police. (Comp. ¶ 30).  He also asked that he be transported to a place where he could drink coffee and smoke cigarettes because smoking was not allowed in the prison. (Comp. ¶ 30).  During this first meeting, Masi never gave plaintiff his *Miranda* rights or told him he had the right to an attorney, even after plaintiff began incriminating himself. (Comp. ¶ 32).

During Masi's interview with plaintiff, Masi pursued a line of leading and coercive questioning. (Comp. ¶ 33).  In response to Masi's questioning, plaintiff stated that he and Mason murdered White. (Comp. ¶ 33).  Plaintiff stated that he knew White was receiving drugs and that he wanted to "rob and torture" White as revenge for firing him.  (Comp. ¶ 33). He and Mason drove to the White's waterbed store and plaintiff hid the murder weapon and a 9 mm gun in his pants. (Comp. ¶ 33).  Mason gave him $1,000 and some drugs after the murder. (Comp. ¶ 33).

3

Two days later, Masi returned to interrogate plaintiff with Mesaros, an assistant

prosecutor. (Comp. ¶ 34).  Initially, Masi and Mesaros failed to provide plaintiff with

*Miranda* warnings during this visit. (Comp. ¶ 36).  They then coerced plaintiff into waiving

his rights. (Comp. ¶ 36).  During this second questioning, plaintiff gave a much different

account of White's murder. (Comp. ¶ 37).  Plaintiff stated that the murder occurred in the

early morning and occurred because his "master Satan told [plaintiff] to kill him." (Comp. ¶

37).  Plaintiff asserted that he planned to kill White because he called him a "patsy" and a

"pawn" and because he fired him. (Comp. ¶ 37).  This time, plaintiff said Mason was not

present and that he had killed White alone with three blows to White's head with a large

"heave-pipe wrench" swung like a baseball bat. (Comp. ¶ 37).  Plaintiff claimed he took

White's briefcase, money, drugs, jewelry, and a 9 mm weapon.  (Comp. ¶ 37).  He was unable

to identify White's clothing. (Comp. ¶ 37).

In May 1992, plaintiff pled guilty to White's murder.  While entering his plea, the

following conversation took place:

> The Court: All right. Your plea in this matter comes out of a situation where you in
> fact gave a statement; do you understand that?
> The Defendant: Yes
> The Court: And based upon that statement and what the state would be able to prove
> because of that statement is the reason that you're making your plea in this matter; is that
> correct?
> The Defendant: Yes.

(Doc. 21 Ex. A).  At that time, plaintiff denied that anyone coerced him into confessing or

pleading guilty.

Defendants never included the police in any investigation or interviews of plaintiff

before he agreed to plead guilty to murder, nor were the police informed beforehand of

4

plaintiff's indictment or plea. (Comp. ¶ 51).  White's widow was also not informed of plaintiff's indictment and plea. (Comp. ¶ 51).  Defendants did not disclose to plaintiff's attorney the earlier statements made by plaintiff, nor did they disclose the questions that were asked of plaintiff and the responses he gave to them, although they knew he was incapable of providing the same information to his attorney given his mental capacity. (Comp. ¶¶ 44, 45). Plaintiff was sentenced to fifteen years to life for White's murder and ten to twenty-five years for aggravated robbery. (Comp. ¶ 53).

In 2004, Eric Bosko, a detective at the Mansfield police department, reinvestigated the White case and concluded plaintiff did not commit the crime. (Comp. ¶ 56).  Bosko presented the case to the Ohio Innocence Project. (Comp. ¶ 57).  After a seven-day evidentiary hearing in 2012, plaintiff was allowed to withdraw his guilty plea. (Comp. ¶ 57).  Judge DeWeese found upon close comparison of plaintiff's confessions that he had  "confessed to killing a man he could not identify, for conflicting motives which don't match the facts, at the wrong time of day, with a weapon that does not match the victim's injuries, by striking him in the wrong part of the head, and stealing items the victim either still possessed after the attack or probably never possessed." (Comp. ¶ 58).  The court said it would be "manifestly unjust to deny the withdrawal of the guilty plea" because the confessions did not provide any support for the conviction. (Comp. ¶ 58).

Thereafter, plaintiff brought suit alleging violations of his constitutional rights. Counts I through VI are § 1983 claims for violations of the Fifth and Fourteenth Amendments, Due Process, Sixth and Fourteenth Amendments, Failure to Intervene, Conspiracy to Deprive Constitutional Rights, and Supervisor Liability.  Count VII is a claim for infliction of

emotional distress.  Count VIII is a claim for civil conspiracy.  Count IX is a state law claim for respondeat superior.  Count X is a state law claim for indemnification.

This matter is now before the Court upon defendants' motion for judgment on the pleadings.

### Standard of Review

A "motion for judgment on the pleadings under Rule 12(c) is generally reviewed under the same standard as a Rule 12(b)(6) motion." *Mellentine v. Ameriquest Mortg. Co.,* 2013 WL 560515 (6th Cir. Feb. 14, 2013) (citing *EEOC v. J.H. Routh Packing Co. .,* 246 F.3d 850, 851 (6th Cir. 2001)):

> The court must construe the complaint in a light most favorable to the plaintiff and accept all factual allegations as true. The factual allegations must raise a right to relief above the speculative level. In other words, the Rule 12(b)(6) standard requires that a plaintiff provide enough facts to state a claim to relief that is plausible on its face. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. Bare allegations without a factual context do not create a plausible claim. A complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory. The bare assertion of legal conclusions is not enough to constitute a claim for relief.

(*Id.*) (internal citations and quotations omitted).

### Discussion

**I. Count I**

In Count I, plaintiff alleges a 42 U.S.C. § 1983 claim against defendants for violations of his Fifth Amendment and substantive due process rights.

**A. Fifth Amendment**

The Fifth Amendment forbids a defendant from being "compelled in [a] criminal case to be a witness against himself." U.S. Const. amend V.  This protection against self-

6

incrimination is applicable to the states by virtue of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 8 (1964).  "[M]ere coercion does not violate the . . . Self–Incrimination Clause absent use of the compelled statements in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 769 (2003)  (plurality opinion). "It is only once compelled incriminating statements are used in a criminal proceeding, as a plurality of six justices held in *Chavez v. Martinez,* that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action." *McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005).

The parties differ on the meaning of "use" in a  "criminal case."  Defendants rely on language from the Supreme Court that describes the Fifth Amendment as a "trial right." *Winthrow v. Williams*, 507 U.S. 680, 692 (1993).  They also point to the Supreme Court's decision in *Chavez v. Martinez* where the defendant's *Miranda* rights were violated, but criminal charges were never filed against him. 538 U.S. at 764.  The Supreme Court held that, because "his statements were never admitted as testimony against him in a criminal case," and he was never "placed under oath and exposed to the cruel trilemma of self-accusation, perjury or contempt," his Fifth Amendment rights were not violated. *Id.* at 767 (internal quotation marks omitted).  The Supreme Court directly reserved the question of when a "criminal case" begins for another day, deciding only that police questioning, without more, does not constitute a "criminal case." *Id.* at 766–67.

Plaintiff contends that his statements were used against him to obtain his guilty plea and were the basis for his conviction.  As such, under *Chavez* and *McKinley*, his statements were used against him in a "criminal proceeding" and he has standing to bring a Fifth Amendment claim.  Plaintiff relies upon cases from the Ninth, Second, and Seventh Circuits

indicating that a "criminal case" for Fifth Amendment purposes begins before trial. *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) (finding a coerced statement is "used" in a criminal case when it is relied on to file formal charges); *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) (concluding that use at a bail hearing was use in a criminal case); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006) ("criminal case" contemplated by Fifth Amendment began with use of involuntary confession to initiate prosecution).

After review, the Court finds that plaintiff has failed to state a Fifth Amendment violation.  Consistent with *Chavez*, the Court concludes that because plaintiff's statements were not introduced against him at trial, he fails to state a Fifth Amendment violation.  In fact, the Sixth Circuit in *Smith v. Patterson*, 430 Fed. Appx. 438, 441 (6th Cir. 2011), notes that "[False confession] claims often arise under the Fifth Amendment . . . But when the government does not try to admit the confession at a criminal trial, the Fifth Amendment plays no role." (citing *Chavez* in support).  The Third, Fourth, and Fifth Circuits appear to be in accord. *See Burrell v. Virginia*, 395 F.3d 508, 513–14 (4th Cir. 2005) (finding that because plaintiff did not allege "any *trial* action that violated his Fifth Amendment rights[,] ... *ipso facto,* his [§ 1983] claim fails") (emphasis in original); *Murray v. Earle,* 405 F.3d 278, 285 (5th Cir. 2005); *Renda v. King,* 347 F.3d 550, 552 (3d Cir. 2003) (stating "that it is the use of coerced statements during a criminal trial, and not in obtaining an indictment, that violates the Constitution.").

The Court need not consider the issue of qualified immunity.

## B. Substantive Due Process

Defendants move for judgment on plaintiff's claim that this conduct also violated

substantive due process.

The Supreme Court has noted that "certain interrogation techniques, either in isolation or as applied to unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton,* 474 U.S. 104, 109 (1985).  Under some circumstances, coercive interrogation alone may violate a suspect's right to substantive due process, even when no self-incriminating statement is used against the person interrogated. *See Chavez v. Martinez,* 538 U.S. 760, 780 (2003).  However, a due process violation will be recognized only where the specific conduct alleged rises to the level of coercive interrogation that "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846-47, n. 8 (1998) (substantive due process rights are violated only when "the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the conscience").

While "negligently inflicted harm is categorically beneath the threshold of constitutional due process . . . at the other end of the culpability spectrum . . . conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849.  The plaintiff need not show that "it was . . . the ultimate purpose of the government actors to harm the plaintiff," but that the defendants acted "with full appreciation of . . . the brutality of their acts." *Id.* at 850 n. 9; *Rochin v. California,* 342 U.S. 165 (1952).  "Deliberate indifference that shocks in one environment may not be so patently egregious in another." *Lewis,* 523 U.S. at 850.  Determining the presence of a due process violation requires an appraisal of "the totality

9

of facts in a given case.  That which may, in one setting, constitute a denial of fundamental

fairness, shocking to the universal sense of justice, may, in other circumstances, and in the

light of other considerations, fall short of such denial." *Id.* (citing *Betts v. Brady,* 316 U.S.

455, 462 (1942)).

After review, the Court denies defendants' motion for judgment on the pleading as to

this claim.  The Court is not persuaded by defendants' argument that plaintiff's substantive

due process claim fails as a matter of law because he does not allege any physical abuse by

defendants.  Conduct need not be physically abusive to shock the conscience. *See, e.g.*, *Wilson*

*v. Lawrence Cnty.*, 260 F.3d 946, 957 (8th Cir. 2001) (finding officers violated clearly

established law where they interrogated a man with known mental retardation, without a

guardian, promised him leniency if he cooperated, and used leading questions to provide him

details of the crime).

Here, plaintiff alleges that he was diagnosed as "paranoid, schizophrenic, depressed

and antisocial" and he "suffered from delusions and hallucinations." (Comp. ¶ 25).  When

Masi and then Masi and Mesaros interviewed him, these conditions were not well-controlled,

as reflected in contemporaneous prison records.  His conditions "would have been

immediately obvious to anyone interacting with Plaintiff." (Comp. ¶¶ 25, 26, 27).  Plaintiff

was not given his *Miranda* warnings during his first interview with Masi and he told Masi "if

you want to pin the murder on me, that's just fine." (Comp. ¶ 30).  Plaintiff offered to confess

to murder in exchange for $250 of his own money so he could buy a radio, cigarettes, and

coffee. (Comp. ¶ 30).  Masi engaged in "unduly leading and coercive questioning" and "fed

Plaintiff details about the crime." (Comp. ¶¶ 33, 43).  Masi then returned with Mesaros and

10

the two again questioned plaintiff.  Defendants "intentionally, with malice, with reckless indifference" coerced statements from him and pursued a "short circuited investigatory process." (Comp. ¶¶ 69,72).  Defendants ignored the obvious inconsistencies between plaintiff's statements and the facts of White's murder. (Comp. ¶ 38).  This was done to close cold cases  "rather than search for the real offenders." (Comp. ¶ 72).  They then presented an involuntary confession to the court which was the sole basis for accepting plaintiff's guilty plea.

At this stage, in the context of a pre-discovery Rule 12(c) motion, a finding that plaintiff is unable to sustain a substantive due process violation would be premature. Plaintiff's claims, in essence, are that defendants exploited his mental condition to get him to make a false confession, failed to investigate when his statements were glaringly inconsistent with the evidence from the crime scene, and pursued a prosecution solely based on a confession they had lead plaintiff to make and knew to be false.  These allegations sufficiently raise substantive due process claims.  *See Winslow,* 696 F.3d 717, 736 (8th Cir. 2012) (denying defendants motion for summary judgment where there was evidence that former criminal defendants had been coerced to provide false testimony and deputies had systematically coached witnesses into providing false testimony);  *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 957 (8th Cir. 2001) (reckless failure to follow up on leads in a murder investigation could shock the conscience).  Defendants' motion as to Masi and Mesaros is denied as to the substantive due process claim.  However, consistent with this Court's Order of December 8, 2014, this claim does not survive Mayer's death.

**II. Count II**

11

In Count II, plaintiff alleges a § 1983 claim against defendants for violating his procedural due process rights.

Plaintiff first contends that defendants violated his rights by withholding exculpatory information from his attorney, namely "statements made during the interrogations" and "questions that were asked of [plaintiff] and responses that he gave." (Comp. ¶ 44-45).  Masi and Mesaros move for judgment on the pleadings on this claim, contending that failure to turn over plaintiff's own statements is not a *Brady* violation, and even if it were, they are entitled to qualified immunity because they did not violate any clearly established right to *Brady* material at the plea stage.

A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

The Court finds that the pleadings fail to state a *Brady* violation. "No *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (per curiam) (citing *United States v. Grossman,* 843 F.2d 78, 85 (2nd Cir. 1988), *cert. denied,* 488 U.S. 1040 (1989)).  "A section 1983 plaintiff cannot base his *Brady* claim on a defendant's failure to disclose plaintiff's own false confession." *Wallace,* 440 F.3d 421, 429–30 (7th Cir. 2006). *See also, Sornberger*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("[Plaintiff] knew herself what occurred during the interrogation, and the police were under no obligation to tell her again that they coerced her into confessing.").  The Court is unpersuaded

12

by plaintiff's argument that because he was incapable of acting "as a proper historian nor communicate information from one source to another" that a different result is warranted. (Doc. 31 p. 10-11).  Plaintiff provides no legal citation that a suspect's mental illnesses impose an augmented obligation on the state to turn over evidence to his counsel.

Additionally, "[t]he doctrine of qualified immunity shields government officials from liability, as well from suit, so long as their official conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hardy v. Jefferson Community College,* 260 F.3d 671, 677 (6th Cir. 2001) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  When functioning as an administrator or an investigator, prosecutors are treated as law enforcement officers and entitled to qualified immunity.  *Buckley v. Fitzimmons*, 509 U.S. 259, 273-74 (1993); *Skinner v. Gorovchin*, 463 F.3d 518, 525 (6th Cir. 2006).  In determining whether a law enforcement officer is entitled to qualified immunity, a court should analyze whether the officer's conduct violated a constitutional right, and whether the right was clearly established.  A court may address either question first. *See Pearson v. Callahan,* 555 U.S. 223 (2009).  In determining whether a right is "clearly established," the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001).  This question must be answered "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (quoting *Saucier,* 533 U.S. at 201).  Plaintiff has the burden of showing that the defendant is not entitled to qualified immunity. *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009).

After review, the Court finds that defendants are entitled to qualified immunity.  In

13

*Robertson v. Lucas*, the Sixth Circuit considered whether law enforcement officers who had not turned over exculpatory evidence to prosecutors were entitled to qualified immunity. 753 F.3d 606 (6th Cir. 2014).  The plaintiffs protested that the government had made misleading disclosures at the plea bargaining stage and this violated their rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Brady v. United States*, 379 U.S. 742 (1970). *Id*. at 620.  Determining that the defendants were entitled to qualified immunity, the Sixth Circuit cited the Supreme Court's opinion in *United States v. Ruiz*, 536 U.S. 622 (2002), which held that the government was not required to disclose material impeachment evidence to a defendant prior to entering a plea.  The court acknowledged it had not yet determined *Ruiz*'s applicability to exculpatory *Brady* material, as well as the divergent answers to this question reached by other circuits. However, the Sixth Circuit concluded that "whatever rights appellants had to receive exculpatory evidence prior to entering their pleas was not clearly established." *Id*. at 621.  The court explained:

> Nor does our own caselaw support appellants' argument that they had a clearly established right to receive exculpatory *Brady* material prior to plea bargaining. We have held that "[i]n general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose. If previously undisclosed evidence is disclosed ... during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *United States v. Word,* 806 F.2d 658, 665 (6th Cir. 1986) (internal citation omitted). Therefore, every reasonable officer in appellees' positions would know that they were under an obligation to present *Brady* material to the prosecutors "in time for its effective use at trial." *United States v. Bencs,* 28 F.3d 555, 561 (6th Cir. 1994).  And in *Campbell v. Marshall,* we held that a prosecutor's failure to disclose arguably exculpatory *Brady* material prior to plea bargaining did not render the defendant's guilty plea involuntary where a factual basis for the plea was established at the plea proceeding. 769 F.2d 314, 318, 323–24 (6th Cir. 1985).

*Id.*

Plaintiff argues that *Campbell v. Marshall* stands for the proposition that he would

14

have been entitled to exculpatory evidence at the time he plead guilty.  The Court disagrees. In *Campbell*, the Sixth Circuit held that a *habeas* petitioner's due process rights were not violated where the presence of a gun on a murder victim was not disclosed to petitioner before he pled guilty. *Campbell*, 769 F.2d at 316.  The court noted that the petitioner's statements made at the time of his plea indicated that his plea was knowing and voluntary. *Id.* at 324. However, the Court does not read *Campbell* as establishing a clear right to exculpatory evidence before a plea, especially in light of *Robertson*'s language and own citation to *Campbell*.  Consequently, the Court concludes plaintiff did not have a clearly established right to exculpatory evidence at the time he pled guilty and defendants are entitled to qualified immunity.

Plaintiff also contends that defendants violated his procedural due process rights because defendants "knowingly procured and/or manufactured false reports and other evidence that was material to Plaintiff's criminal case, thereby misleading and misdirecting the criminal prosecution." (Comp. ¶ 79).  Defendants contend that this claim should be dismissed because plaintiff does not point to any evidence that defendants fabricated reports. Plaintiff does not differentiate between his allegations that defendants coerced his false confession and allegations that defendants fabricated his confession.  Plaintiff responds that it is the presentation of his coerced false confession to the court, which was the factual basis for accepting his guilty plea, that constitutes the procedural due process violation.

That "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, [is] implicit in any concept of ordered liberty." *Napue v. People of State of Ill*., 360 U.S. 264, 269 (1959). *United States v. Agurs,* 427 U.S. 97, 103 (1976) ("[A]

15

conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."). "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States,* 405 U.S. 150, 153 (1972) (imputing knowledge of false evidence to trial prosecutor to find due process violation) (quotation omitted); *see also Napue,* 360 U.S. at 269 ("The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").

Since plaintiff alleges that defendants, "despite knowing the confessions were false," presented these confessions to a court as the basis to convict him of murder, the Court finds that this states a procedural due process claim as to defendant Masi.

Defendant Mesaros moves for judgment on the basis of absolute immunity. The Court agrees it is warranted. In a prosecutor's advocacy role, he maintains absolute immunity. *See e.g., Imbler v. Pachtman,* 424 U.S. 409, 431 (1976) (holding that a prosecutor is cloaked with absolute immunity "in initiating a prosecution and in presenting the State's case"); *Spurlock v. Thompson,* 330 F.3d 791, 797 (6th Cir. 2003) (explaining that "even the knowing presentation of false testimony at trial is protected by absolute immunity"); *Jones v. Shankland,* 800 F.2d 77, 80 (6th Cir. 1986) (concluding that the "use of perjured testimony and the non-disclosure of exculpatory information are certainly entitled to absolute immunity"); *Grant v. Hollenbach,* 870 F.2d 1135, 1138 (6th Cir. 1989) (explaining that the decision to prosecute is afforded absolute immunity). Consequently, the Court finds Mesaros is entitled to absolute immunity.

As to defendant Mayer, consistent with this Court's Order of December 8, 2014, this

16

claim does not survive his death.

### III. Count III

Defendants move for judgment on plaintiff's § 1983 claim in Count III, which is premised on a Sixth Amendment violation.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also Gideon v. Wainwright,* 372 U.S. 335, 342–43 (1963) (holding that Sixth Amendment right to counsel extends to state court proceedings through the Fourteenth Amendment).

After review, the Court agrees that defendants are entitled to judgment on Count III. In the complaint, plaintiff alleges that defendants questioned him and coerced him into confessing to White's murder.  There is, however, no allegation that any of these questionings took place after proceedings had begun against plaintiff.  As it is well-settled that Sixth Amendment rights attach only upon the initiation of adversarial judicial proceedings, plaintiff's § 1983 claim fails. *United States v. Gouveia*, 467 U.S. 180, 187 (1984); *see also Moran v. Burbine*, 475 U.S. 412, 428–31 (1986) (no right to counsel in preindictment interrogations); *Kirby v. Illinois*, 406 U.S. 682, 688–90 (1972) (plurality opinion) (no right to counsel at preindictment identifications).  The Court is unpersuaded by plaintiff's argument that *Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006) warrants a different result.  Consequently, judgment on the pleadings on Count III is granted.

### IV. Count IV

Defendants argue that plaintiff's failure to intervene claim in Count IV is noncognizable.  It is not a constitutional tort, but rather it is a theory of derivative liability for

other constitutional torts.  Even if it is valid claim, plaintiff's allegations are conclusory as he fails to show any defendant failed to intervene.

Failure to intervene is recognized by the Sixth Circuit. *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (concluding that the plaintiff had failed to make out one of the elements of a § 1983 "failure to intervene" claim).  The Court, however, does not find that the allegations in the Complaint sufficiently state such a claim.  The elements of the failure to intervene claim are "(1) the defendant observed or had reason to know that the constitutional violation was occurring, and (2) had both the opportunity and the means to prevent the harm from occurring.  *See Turner v. Scott,* 119 F.3d 425, 429 (6th Cir. 1997).  Here, plaintiff alleges that Masi and Mesaros worked together, interviewed plaintiff, took advantage of his mental conditions to get him to confess to White's murder with the use of coercive and leading questions, and failed to investigate discrepancies between plaintiff's statements and the facts of White's murder. (Comp. ¶¶ 31, 34-36, 38, 43, 48).  These allegations are insufficient to establish a failure to intervene by either Masi or Mesaros.  The Complaint alleges these two defendants worked together.  There is no allegation that either one merely observed the other and failed to take action.  Therefore, judgment for defendants Masi and Mesaros is granted.

As to defendant Mayer, consistent with this Court's Order of December 8, 2014, this claim does not survive Mayer's death.

**V. Count V**

Defendants move for judgment on plaintiff's § 1983 claim for conspiracy to deprive him of his constitutional rights, arguing that it is inadequately plead.

18

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007); *Hooks v. Hooks,* 771 F.2d 935 (6th Cir. 1985).  To prevail on a § 1983 conspiracy claim, plaintiff must show that (1) a "single plan" existed, (2) the defendant "shared in the general conspiratorial objective" to deprive plaintiff of his constitutional rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to plaintiff. *Bazzi v. City of Dearborn,* 658 F.3d 598, 602 (6th Cir. 2011).  It is not necessary for plaintiff to establish an express agreement among all the conspirators to find the existence of a civil conspiracy, nor does he have to demonstrate that each conspirator knew all of the details of the illegal plan or all of the participants involved. *Id.*  Conspiracy claims, however, must be pled with some degree of specificity and vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983. *Spadafore v. Gardner,* 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch,* 826 F.2d 1534, 1538 (6th Cir. 1987).  A plaintiff must make sufficient factual allegations to link two alleged conspirators in the conspiracy and to establish the requisite "meeting of the minds" essential to the existence of the conspiracy. *Amadasu v. The Christ Hosp.,* 514 F.3d 504, 507 (6th Cir. 2008); *McDowell v. Jones,* 990 F.2d 433, 434 (8th Cir. 1993).

 Defendants contend that the claim is insufficiently pled because there is no actionable underlying constitutional claim, there is no allegation that the parties had a "meeting of the minds," and the intracorproate conspiracy doctrine bars the claim.

Having concluded that plaintiff has sufficiently stated underlying constitutional claims, the Court turns to defendants' other arguments.

19

Defendants question whether plaintiff has sufficiently alleged that they had the requisite meeting of the minds to state a claim for conspiracy.  In the Complaint, plaintiff alleges that Masi, Mesaros, and Mayer "agreed among themselves and with other individuals to act in concert" to deprive plaintiff of his constitutional rights. (Comp. ¶ 99).  Masi returned to question plaintiff with Mesaros and took advantage of his mental health to get him to confess to White's murder. (Comp. ¶¶ 34-35).  Masi, Mayer, and Mesaros coerced him with money, cigarettes, and coffee to confess. (Comp. ¶ 31).  Mayer was advised of all developments and provided advice and direction to Masi and Mesaros. (Comp. ¶ 36).  Masi, Mesaros, and Mayer never disclosed to plaintiff's attorney that Masi and Mesaros fed Plaintiff details about the crime. (Comp. ¶ 43). Mayer, Masi, and Mesaros pursued the case against plaintiff all the way through prosecution even though they had no reasonable basis to believe that plaintiff was guilty of the crime given the inconsistencies between plaintiff's first two confessions and the information Masi, Mayer, and Mesaros knew about White's murder. (Comp. ¶ 38, 48).  The Court finds this sufficiently supports an agreement between Masi, Mesaros, and Mayer.

Finally, the Court does not agree that the intracorporate conspiracy doctrine bars plaintiff's claim.  As plaintiff notes, all of defendants' cases on this issue are § 1985 cases. *See Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999), *overruled on other grounds by Swierkiewcz v. Sorema, N.A.*, 534 U.S. 606 (2002); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991); *Jocham v. Tuscola County*, 239 F. Supp. 3d 714, 732 (E.D. Mich. 2003).  In response, plaintiff presents cases indicating that the intracorproate conspiracy doctrine does not apply in § 1983 cases, or only

20

shields the municipality. *Adcock v. City of Memphis*, No. 06-2109, 2007 WL 784344 (W.D. Tenn. March 13, 2007) (disallowing claim against the City under doctrine, but allowing for possibility of claim against employees); *Kinkus v. Vill. of Yorkville*, 476 F. Supp. 2d 829, 841 (S.D. Ohio 2007) *rev'd on other grounds sub nom. Kinkus v. Vill. of Yorkville*, Ohio, 289 F. App'x 86 (6th Cir. 2008) ("Plaintiff does not claim that Officer Popp or Chief Anderson conspired with Yorkville to injure him bars the application of the doctrine. . . . As such, extending the policy behind the intracorporate conspiracy doctrine from the realm of 42 U.S.C. § 1985 to 42 U.S.C. § 1983 is not appropriate in this case.").  Defendants fail to respond to plaintiff's argument.

Consequently, the Court is unpersuaded that defendants are entitled to judgment as a matter of law on this point. *Elersic v. Lake County,* 2005 WL 1353864, at *4 (N.D. Ohio June 7, 2005) ("[B]ecause Mr. Elersic does not refer to Section 1985 anywhere in his complaint," the court declined to apply the intracorporate conspiracy doctrine to § 1983 claims). However, consistent with this Court's Order of December 8, 2014, this claim does not survive Mayer's death.

### VI. Count VI

Count VI states a claim for supervisor liability against Mayer because he "approved, assisted, condoned or purposely ignored Defendants' commission of" constitutional injuries. (Compl. ¶ 110).  Additionally, the claim states that Mayer was acting as the final policymaker for Richland County and, as such, Richland County is also liable for any misconduct.  This Court determined in its Order on December 8, 2014 that this claim against Mayer did not survive his death.

## VII. Count VII

To state a claim for intentional infliction of emotional distress, a plaintiff must allege:

1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Rosebrough v. Buckeye Valley High School*, 690 F.3d 427, 433 (6th Cir. 2012) *(quoting*

*Burkes v. Stidham*, 107 Ohio App.3d 363, 668 N.E.2d 982, 989 (Ohio Ct.App.1995).

Defendants question whether plaintiff has stated a claim for extreme and outrageous behavior.  After review, the Court finds that he has.

Plaintiff alleges that Mayer, Masi, and Mesaros took advantage of plaintiff's plainly vulnerable mental state to coerce him by bribery and the use of leading questions to get him to confess to a murder he did not commit.  Defendants knew plaintiff's confession was false because they had fed him the details of White's murder. (Comp. ¶ 47 ).  They ignored inconsistencies between his confessions and prosecuted him solely based on his coerced confessions.  The Court finds that plaintiff has stated a claim that Mayer, Masi, and Mesaros's conduct is extreme and outrageous.

## VIII. Count VIII

Under Ohio law, a civil conspiracy consists of: (1) a malicious combination of; (2) two or more persons; (3) injury to person or property; and (4) the existence of an unlawful act independent from the actual conspiracy. *Davidson v. BP Am., Inc.* (1997), 125 Ohio App.3d 643, 652. Similar to federal law, a conspiracy claim must be pled with some specificity;

22

unsupported, conclusory allegations are insufficient. *Avery v. Rossford, Ohio Transportation Improvement Dist.*, 145 Ohio App.3d 155, 165, 762 N.E.2d 388 (Ohio Ct. App. 2001).

Defendants challenge whether plaintiff has sufficiently plead facts supporting the claim that defendants "maliciously combined."  For the reasons set forth in the Court's discussion of the § 1983 conspiracy claim, the Court finds that plaintiff has sufficiently stated a malicious combination claim against Mayer, Mesaros, and Masi.

### IX. Count IX

Richland County moves to dismiss plaintiff's state law claim for respondeat superior which alleges that Richland County is liable as a principal for all torts committed by its agents.  Specifically, Richland County contends that it has statutory immunity for plaintiff's state law claims.

Political subdivisions in Ohio are immune from liability for injury to a person caused by any act in connection with a governmental or proprietary function. Ohio Rev. Code § 2744.02**.**  Prosecutorial functions are governmental functions. O.R.C. § 2744.01(C)(2)(f). There is no exception to immunity based upon the doctrine of *respondeat superior.* O.R.C. § 2744.02(B); *Lassen v. Lorain Cnty*., Ohio, No. 1:13 CV 1938, 2014 WL 3511010, at *9 (N.D. Ohio July 14, 2014)*; Hazley v. City of Akron* (July 22, 1998) 9th Dist. No. CA1 8756, 1998 WL 417391.  To the extent that plaintiff's Complaint alleges intentional torts, "Ohio courts have consistently held that political subdivisions are immune under O.R.C. § 2744.02 from intentional-tort claims." *Williams v. McFarland Properties, L.L.C.* (2008), 177 Ohio App.3d 490, 494, 895 N.E.2d 208.

Consequently, the Court finds that Richland County is entitled to statutory immunity

for plaintiff's state law claims.  Judgment for Richland County is granted.

### X. Count X

Count X states: "Ohio Revised Code § 2744.07 provides that political subdivisions are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities." (Comp. ¶ 129).  Plaintiff therefore brings an indemnification claim against Richland County.  Defendants contend that there is no such tort as "indemnification."

Ohio Revised Code § 2744.07(A)(1) states that "a political subdivision shall provide for the defense of an employee, in any state or federal court, in any civil action or proceeding which contains an allegation for damages for injury, death or loss to person or property caused by an act or omission of the employee . . ."

After review, the Court grants judgment for defendants on this claim.  The duty to defend accrues if "the act or omission occurred while the employee was acting both in good faith and not manifestly outside the scope of employment or official responsibilities." O.R.C. § 2744.07(A)(1).  However, the duty to indemnify accrues upon issuance of a judgment against the employee for compensatory damages caused by an act or omission in connection with a governmental function.  O.R.C. § 2744.07(A)(2).  Should the political subdivision fail to uphold its duty, the statute outlines a mechanism for Ohio courts to consider the employee's claims and to "order the political subdivision to defend the employee in the action." O.R.C. § 2744.07(C).  At this stage in the proceedings, an indemnification claim is not ripe.  *Ayers v. City of Cleveland,* No. 1:12 CV 753, 2013 WL 775359, at *15-16 (N.D. Ohio Feb. 25, 2013) *appeal not considered*, 773 F.3d 161 (6th Cir. 2014).  *But see, Vaughan v. City of*

*Shaker Heights,* No. 1:10 CV 0609, 2011 WL 5966732, at *5 (N.D. Ohio Nov. 28, 2011) *aff'd in part, rev'd in part*, 514 F. App'x 611 (6th Cir. 2013).  Judgment for defendants is granted.

### XI. *Monell* Claims

A plaintiff may sue a municipality under § 1983 for executing a government policy or custom that inflicts the injury for which the government as an entity is responsible. *Amerson v. Waterford Tp.,* —— Fed.Appx. ——, 2014 WL 1424500 (6th Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "The custom or policy must be the 'moving force' behind the constitutional violation, so the plaintiff needs to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Id.* (citations omitted).

A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005).

Richland County moves for judgment on plaintiff's *Monell* claims, arguing that they are insufficiently plead and not supported by factual allegations in the Complaint.

Plaintiff alleges that Richland County had illegal policies of failing to intervene to prevent violation of constitutional rights, conspiring to deprive individuals of their constitutional rights, and supervisor liability.  However, there are no specific allegations in the

25

Complaint supporting a municipal policy or custom.  As such, the Court finds they fail to state a claim for a policy or practice by Richland County on this basis.

Plaintiff further alleges that Mayer ratified decisions to: withhold exculpatory evidence and knowingly produced false reports, deprived suspects of their Sixth Amendment rights, failed to intervene, and conspired to deprive constitutional rights. (Comp. ¶ 105).

Plaintiff's *Monell* claims based on withholding exculpatory evidence, producing false reports, Sixth Amendment violations, and failure to intervene fail because the Court has found no underlying constitutional violations. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).  However, plaintiff's allegation that Mayer acted as the final policymaker for the County and that he ratified decisions to conspire to deprive plaintiff of his constitutional rights sufficiently establish a claim for *Monell* liability.

Defendants argue that plaintiff fails to allege elements and supporting facts to plausibly state a custom or policy for failure to train "on proper investigative techniques and how to handle mentally ill witnesses and suspects." (Comp. ¶ 75).

"Failure to provide employees with adequate training may also give rise to *Monell* liability when it evinces deliberate indifference for the rights of those with whom the governmental employees have contact, such that the inadequate training may be fairly said to represent the government's policy or custom." *Brown*, 517 Fed. Appx. at 436.

The Complaint is devoid of any other allegation of mishandling of "mentally ill witness and suspects."  As such, judgement on the pleadings for defendants is warranted.

Finally, the Complaint contends that Richland County had "widespread practices, so well-settled as to constitute *de facto* policy" of being deliberately indifferent to coercive

26

interrogations, feeding witnesses and defendants information about crimes, withholding material evidence from defendants, and pursuing wrongful convictions. (Comp. ¶¶ 67, 72). Again, absent any other allegation of this conduct, plaintiff's *Monell* claim fails.

Conclusion

For the reasons set forth above, defendants' motion is GRANTED IN PART and DENIED IN PART.  Judgement for defendants is granted on Count I as to plaintiff's Fifth Amendment Claim but denied as to a violation of substantive due process against Masi and Mesaros.  Regarding Count II, judgment is rendered for defendant Mesaros but denied as to defendant Masi on the procedural due process claim.  Judgment for defendants is also granted on Counts III, IV, VI, IX, and X.  Finally, judgment for defendant Richland County on plaintiff's *Monell* claims is granted for all claims except the conspiracy claim on a ratification theory.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan_____
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/10/15