**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Glenn Tinney, | ) | CASE NO.  1:14 CV 703 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Richland County, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |


<u>Introduction</u>

This matter is before the Court upon defendants' Motion for Summary Judgment
(Doc. 51) and defendant Joe Masi's Supplemental Motion for Summary Judgment (Doc. 69).
For the following reasons, both motions are GRANTED.

<u>Facts</u>

Plaintiff Glenn Tinney filed his Complaint against defendants Richland County, James
M. Mayer, Jr. (Richland County prosecutor, now deceased), Joesph Masi (Richland County
prosecutor's investigator), and David Mesaros (Richland County assistant prosecutor).
Following rulings by this Court, the following claims remained: violation of substantive due

1

process against Masi and Mesaros (Count One), violation of procedural due process against

Masi (Count Two), federal conspiracy claim against Masi and Mesaros (Count Five), state

law claims of intentional infliction of emotional distress and conspiracy against Mayer, Masi,

and Mesaros (Counts Seven and Eight), and *Monell* claims of conspiracy and ratification

against Richland County.  A Second Amended Complaint was then filed adding a malicious

prosecution claim against Masi (Counts Eleven and Twelve).[1]

On August 11, 1988, Ted White was found with severe injuries to his head

inside of his Mansfield, Ohio store, Akron Mattress and Waterbed. White died of his injuries

on August 13, 1988 at Mansfield General Hospital. He had suffered severe trauma to his head,

and treating doctors told investigators that he appeared to have been struck with a tire iron or

some type of blunt instrument.

The Mansfield Police Department conducted an initial investigation but there were no

eyewitnesses, no forensic evidence linking any person to the homicide, and no indication that

anything had been stolen. Interviews were conducted and a lead regarding Matt Mason, a

former employee of White, was considered.  Eventually, the case "went cold."

According to Masi's affidavit, one of his duties as an investigator was to help

investigate unsolved cases.  One such case involved the Gurcia Johnson homicide. During this

investigation, Masi received a tip from a witness, Joe Griffith.  Griffith was a reliable

informant and the tip led to the conviction of Matt Mason for the homicide.  On October 18,

1990, during that investigation, Griffith also related that Glenn Tinney told Griffith's sister

---

[1]     Despite this Court's previous ruling dismissing some claims and portions of
        claims, plaintiff re-pleads all claims in his Second Amended Complaint.

2

and her husband (the Crawfords) that Matt Mason "hit some guy over the head that owned a waterbed store" in the summer of 1988. In February 1991, Masi interviewed Griffith to get more information regarding Tinney's alleged statement.  The Mansfield Police Department did not follow up on Griffith's statement.

In 1992, Mayer, who was running for re-election and had promised to solve cold homicide cases, requested several unsolved case files from the police.  One was the Ted White case which Mayer instructed Masi to review.

According to Masi's contemporaneous notes of these events, Masi asked Griffith on March 23, 1992 where he could locate Tinney, and was told he was in prison or possibly the Massillon State Hospital. Masi was aware that the latter is a psychiatric hospital.  The next day, Masi interviewed Griffith's sister and her husband (the Crawfords) who told him that Tinney worked for White at the waterbed store.  Tinney told them that Mason told Tinney in 1988 that he snuck up behind White in the store while White was putting money in the deposit bag.  Mason said that he hit White over the head with the butt of a gun, took the money, and fled the store. Masi located Tinney at the Lebanon Correctional Institute and arranged to interview him on March 31, 1992.

Masi testified that prior to the interview, he did not review the case file, he had not been involved in the 1988 investigation, and he knew nothing about the crime except that Ted White was killed inside a waterbed store.  (Masi depo. 78-79)

According to Masi's contemporaneous notes of the one hour interview, he met with Tinney at Lebanon Correctional Institute on March 31, 1992, and the following transpired. Masi identified himself as an investigator from the Richland County Prosecutor's Office

investigating the Ted White homicide case.  Tinney responded by stating that he knew

nothing about it and did not have anything to do with it.  Masi informed Tinney that he was

not there to interview him as a suspect but as someone with knowledge of the suspect. Tinney

responded that "if we wanted to pin the homicide on him we could he didn't care one way or

the other."  Masi re-emphasized to Tinney that he was not listed as a suspect in the

investigation and that Masi's purpose there that day was solely to obtain information that

Masi had not obtained through other sources.  Tinney requested to know what Masi had heard

and from what sources. At that point, Masi decided to disclose to Tinney some of the

pertinent information that he had received, including the arrest and conviction of Matt Mason

for the Gurcia Johnson homicide.[2]  Tinney stated, "You're on the right track.  You're hot,

hotter than you think."  Tinney further stated that he was sure Masi was on the right track

because "We had split the money up after we left." When asked to clarify, Tinney replied,

"It's just what I said, we."  Tinney stated that he knew Masi's information was correct

because he was with Mason during the offense.  Tinney then asked if the murder weapon was

ever found and Masi responded that he did not believe it was.  Tinney then grinned and asked

if the coroner or police had any idea of what kind of weapon was used. Masi told him he did

not have access to that information. Masi told Tinney he was interested in the information

Tinney had, but that he did not want him to tell Masi anything else that would incriminate

him.  Tinney stated that he could help the prosecutor's office if they could help him.  Masi

---

[2]     Plaintiff asserts in his brief that Masi "fed [him] information about the crime"
        which included its location (the waterbed store), motive (money), mode of assault
        (blows from behind), and Mason's flight after the crime.  (Doc. 57 at 6) Plaintiff
        points to Masi's deposition testimony wherein he testified that he told plaintiff
        what the Crawfords had told him.  (Masi depo. 82-84)

4

told Tinney he was in no position to make deals but he would take his requests to the prosecutor who would have to be reasonably sure that Tinney had some knowledge of the crime.  Tinney stated that he wanted $523.77 which had been confiscated when he had been arrested for the offenses for which he was now imprisoned, to be transferred to MANCI, and a good word to the parole board at his next hearing. Masi then asked Tinney what information he wanted to take back to the prosecutor.  Tinney stated that he and Mason traveled to the waterbed store with the purpose of robbing and torturing White.  They rode together and parked a short distance away.  Tinney had the murder weapon along with a Rosco Barretta 9mm, both tucked in his pants. Upon entering the store, they approached White from behind and Tinney handed Mason the murder weapon which he used to strike White on the head. Meanwhile, Tinney rummaged through the store.  They stole money and drugs, and Mason gave Tinney about $1,000.  The murder weapon was discarded on West Third Street, the property having been demolished since the homicide.  Mason fled to Indiana shortly after the homicide. Tinney indicated that the reason for the crime was related to White firing Tinney. Mason was doing work for White during this time.  At the time, both Tinney and Mason were under the influence of drugs and alcohol. Masi told Tinney he would take the information to the prosecutor.  Tinney wanted to know what would happen if he was charged with robbery and Masi told him he would get back with him after talking with the prosecutor.  (Doc. 57 Ex. 18)

Masi did not advise Tinney of his *Miranda* rights.  (Masi depo.82) Masi avers that during the interview, he never saw any indication that Tinney was mentally ill or developmentally delayed, and that he was alert and answered the questions appropriately.

5

That night or the next day, Masi spoke with Mayer or Mesaros as to what Tinney had told him.  Mayer directed Masi and Mesaros to go back to Lebanon Correctional Institution to speak with Tinney again.

Masi's contemporaneous notes show that on April 1, 1992, he received a collect call from Tinney who stated, among other things, that he would no longer seek a chance for freedom through the parole board or a transfer to MANCI.  Tinney asked if Masi had spoken to the prosecutor yet and asked some questions about the coroner's report on Ted White. Tinney asked whether, when transferred to the county, he would be able to smoke cigarettes and have coffee. (Masi aff. Ex.1)

A statement was prepared on April 2, 1992 by Tinney's Unit Manager relating that Tinney told the Unit Manager that he killed "Tim White" with a pipe wrench.  (*Id.*)  In a notarized statement, dated April 2, 1992, Tinney stated that he was willing to help the Richland County Prosecutor's Office solve the homicide: "I will cooperate with the prosecutors office of my own free will." He also stated that he had "not been threatened or pressured in any kind of way by said prosecutors office or anyone else."  (*Id.*) Both items were presented to Masi and Mesaros when they arrived for the interview on April 2, 1992.

Masi avers that before his second meeting with Tinney, he began to review the Ted White case file.  On April 2, 1992, he and Mesaros met with Tinney.  According to Masi's notes, after talking with Tinney for 45 minutes "about his involvement, personal life, history[,] and background, Tinney decided to give us a mirandized statement to take to the Prosecutor for his review to determine what Tinney would be charged with." (Masi aff. Ex. 1) Masi testified that during the 45 minute discussion, Tinney told them that he was not going to

6

implicate Matt Mason because he was afraid of him.  (Masi depo. 140-141)

A transcript (and audio recording) of the statement (but not the 45 minute previous discussion) is submitted.  After receiving his *Miranda* warning, Tinney related that he killed Ted White himself, by hitting him on the back of the head three times with a pipe wrench, because he wanted revenge for White firing him.  He also robbed White of money, drugs, and a gun.  Tinney asked for water during the interview indicating that the medication he was on "dries him out." He also stated that at the time of the murder, he had been taking "psych medicine."

Masi avers that, as he had already testified, although he believed Tinney was involved, he did not believe that Tinney committed the homicide by himself, but that Matt Mason was involved and Tinney was afraid of him.  Mesaros avers the same.

Masi testified that he and Mesaros discussed on the return trip from the prison that some of what Tinney had told them did not "jive with the facts" of the case or were "flat-out inaccurate."  For instance, during his statement, Tinney said that he arrived in the morning and waited until he saw Ted White's car pull up to the store.  Masi knew from the file that Ted White was driven to the store that day by someone else and did not arrive in his own car.  Also, Tinney said the attack occurred in the early morning, but Masi knew it had occurred in the afternoon. Tinney said he struck White in the head from behind, but Masi also knew he had injuries to the face. There was no evidence of the items Tinney said he stole from White, and there was never an indication that Tinney worked for White. (Masi depo. 191, 155-156, 172, 176-178, 100-101)   There were also discrepancies between Tinney's two statements.

Mesaros never instructed Masi to do any further investigation to corroborate Tinney's

April 2 statement.  (Mesaros depo. 119) Masi testified that after completing the April 2 interview, Mesaros told him not to do anything else on the case.  (Masi depo. 201, 203)

According to Mesaros, on either April 2 or 3, he and Mayer discussed potential charges against Tinney.  They believed there was probable cause to prosecute him.  They made the decision to present the case to the grand jury. Masi had no involvement in the prosecutorial decision.  (Mesaros aff.)  Masi testified at the grand jury hearing. On May 6, 1992, Tinney pled guilty to the indictment with the assistance of counsel.

Prior to Tinney's plea, the Mansfield Police Department was not notified by the prosecutor's office of the results of the investigation or the decision to charge Tinney.  Masi testified that it was "implied" that he not talk to the police about the investigation.  (Masi depo. 213)  Mansfield Police Captain John Arcudi testified that when the police learned of Tinney's confession, their impression was "this guy is nuts and.. something is wrong here." (Arcudi depo. 45)   Arcudi interviewed Tinney on June 24, 1992, along with Masi.  He thought Tinney's responses were "crazy."  (*Id.* 280) In his contemporaneous report, Arcudi states that based on Tinney's lack of knowledge of the facts of the crime and the 65 discrepancies between this interview and that of Tinney's April 2 statement, Tinney "said ABSOLUTELY NOTHING that would truly confirm in my mind that he is the one who committed this crime."  (Doc. 57 Ex. 27)

Tinney was also interviewed by a newspaper reporter on June 17, 1992 who concluded based on Tinney's responses that he did not commit the crime.  (Debra Baker depo. 39)

Defendants submit the expert report of James John Karpawich, Ph.D, a clinical and

forensic psychologist who evaluated Tinney and concluded that "there is insufficient information based on his statements and the records from that period of time that Mr. Tinney was suffering from symptoms of a severe and persistent mental illness when he confessed to the murder of Ted White in the spring of 1992."  (Doc. 51 Ex. 8)

Plaintiff submits the expert report of James Trainum, a retired police homicide detective and investigator who concludes that the prosecutor's investigator failed to perform even the most basic research into Tinney's background and did not familiarize himself with the investigative file before the March 31 interview.  Following the first interview, Masi ignored numerous red flags that indicated problems with Tinney's mental health and the reliability of the confession. He failed to corroborate or evaluate the confession.  Neither the prosecutor nor the investigator performed basic research into Tinney's background prior to the April 2 interview.  There was no follow up on the red flags which presented themselves on this date regarding mental health issues. There was only a minimal review of the investigative file.  Reg flags regarding the reliability of this confession, which was factually inaccurate, were ignored.  Although the prosecutor and investigator admitted that they thought the April 2 confession was false, they proceeded to prosecute Tinney for murder, contrary to proper policing and investigation.  No attempt to further investigate was made after the April 2 interview.  A reasonable investigator would have explored Tinney's background and the inconsistencies in both confessions, and recognized that neither was reliable or a basis to pursue criminal charges. (Doc. 57 Ex. 8)

Additionally, plaintiff submits the forensic psychological assessment of Scott A. Bresler, Ph.D who concludes that Tinney suffered from mental illness in late March to early

9

April 1992 that would have rendered him more vulnerable to persuasion and placed him at risk for giving false information to investigators about the killing. As a result of his mental illness at the time, investigators needed to be exceedingly careful about information they provided him, and extraordinarily conscientious in their efforts to corroborate his confession. (Doc. 57 Ex. 16)

Finally, plaintiff submits the expert report of John D.Sammon, a retired Assistant U.S. Attorney who concludes, after enumerating nine significant instances in which "the prosecution team acted wrongfully, inexcusably and even, at times, disgracefully in the investigation and prosecution of Glenn Tinney," the prosecution team drastically deviated from the proper means and procedures of criminal investigation and prosecution.  (Doc. 57 Ex. 23)

In 2013, the state court permitted plaintiff to withdraw his guilty plea. In June 2015, the indictment against plaintiff was dismissed.

This matter is now before the Court upon defendants' Motion for Summary Judgment and  Masi's Supplemental Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its

> motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

11

**Discussion**

**(A) Defendants' Motion for Summary Judgment**

**(1) substantive due process**

Count One alleges that defendants conducted an unconstitutionally coercive interrogation of plaintiff which overbore his will and caused him to make involuntary statements implicating himself in the murder of Ted White in violation of plaintiff's Fourteenth Amendment rights.

This Court previously recognized[3] that the Supreme Court has noted that "certain interrogation techniques, either in isolation or as applied to unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton,* 474 U.S. 104, 109 (1985).  Under some circumstances, coercive interrogation alone may violate a suspect's right to substantive due process, even when no self-incriminating statement is used against the person interrogated. *See Chavez v. Martinez,* 538 U.S. 760, 780 (2003). However, a due process violation will be recognized only where the specific conduct alleged rises to the level of coercive interrogation that "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846-47, n. 8 (1998) (substantive due process rights are violated only when "the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the conscience").

 While "negligently inflicted harm is categorically beneath the threshold of

---

[3]     *See* Memorandum of Opinion and Order granting in part and denying in part
        defendants' Motion for Judgment on the Pleadings (Doc. 35)

constitutional due process . . . at the other end of the culpability spectrum . . . conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849.  The plaintiff need not show that "it was . . . the ultimate purpose of the government actors to harm the plaintiff," but that the defendants acted "with full appreciation of . . . the brutality of their acts." *Id.* at 850 n. 9; *Rochin v. California,* 342 U.S. 165 (1952).  "Deliberate indifference that shocks in one environment may not be so patently egregious in another." *Lewis,* 523 U.S. at 850.  Determining the presence of a due process violation requires an appraisal of "the totality of facts in a given case.  That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Id.* (citing *Betts v. Brady,* 316 U.S. 455, 462 (1942)).

 The Fourteenth Amendment shock-the-conscience claim involves a "higher standard" than the "traditional Fifth Amendment claim" where the government tries to admit a forced false confession at a criminal trial.  *Smith v. Patterson*, 430 Fed.Appx. 438 (6th Cir. 2011) The inquiry in the former is whether the interrogation technique was so offensive to a civilized system of justice that it violates the right to substantive due process. *Id.*  That an officer obtained a false confession does not by itself shock the conscience.  *Id.*

 Defendants argue that this claim fails because defendants' interview techniques did not shock the conscience.  Defendants further argue that, to the extent alleged, there is no cognizable substantive due process claim based upon reckless investigation in this Circuit.  Defendants note that the Complaint (and Second Amended Complaint) seem to assert a

substantive due process claim based upon a reckless investigation.  In particular, in the factual portion of the Complaint plaintiff alleges that the inconsistencies between plaintiff's first and second confessions and the information defendants knew about the crime were remarkable. Defendants made no effort to investigate the inconsistencies.  Defendants pursued the case against plaintiff all the way through prosecution even though defendants had no reasonable basis and no probable cause to believe plaintiff was guilty of the crime.  (¶¶ 38, 46, 48)

Initially, this Court agrees with defendants that plaintiff's substantive due process claim is limited to the interview techniques and not the overall alleged reckless investigation. The Court will address the latter and then proceed to whether the interview techniques amounted to a substantive due process violation.

Defendants point out that the Supreme Court has recognized that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266 (1994).  The Sixth Circuit "recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (citations omitted).  The Sixth Circuit has not recognized a substantive due process claim for "reckless investigation," and two district courts within this Circuit have declined to do so. In *Cross v. Metropolitan Government of Nashville,* 2013 WL 1899169 (M.D.Tennessee 2013), the court rejected plaintiff's claim of violation of substantive due process based on defendants' inadequate investigation and decision to seek an indictment

14

without probable cause because the Fourth Amendment already provided the protection.  In *Buchanan v. Metz,* 6 F.Supp.3d 730 (E.D.Mich. 2014), the court stated that plaintiff had not presented any binding authority permitting him to recast his Fourth Amendment malicious prosecution and false arrest claims into a substantive due process claim.

Plaintiff contends that defendants' argument is "in direct conflict with this Court's directive"(Doc. 57 at 16) issued in its ruling on the Motion for Judgment on the Pleadings wherein this Court stated:

> At this stage, in the context of a pre-discovery Rule 12(c) motion, a finding that plaintiff is unable to sustain a substantive due process violation would be premature. Plaintiff's claims, in essence, are that defendants exploited his mental condition to get him to make a false confession, failed to investigate when his statements were glaringly inconsistent with the evidence from the crime scene, and pursued a prosecution solely based on a confession they had lead plaintiff to make and knew to be false. These allegations sufficiently raise substantive due process claims. *See Winslow* [*v. Smith*]*,* 696 F.3d 717, 736 (8th Cir. 2012) (denying defendants' motion for summary judgment where there was evidence that former criminal defendants had been coerced to provide false testimony and deputies had systematically coached witnesses into providing false testimony).

(Doc. 35 at 11) Plaintiff asserts that the evidence "supports such a claim."  (Doc. 57 at 16) Specifically, plaintiff asserts that Masi and Mesaros knew of Tinney's mental illness and exploited it to get him to make a false confession, failed to investigate when Tinney's statements were inconsistent with the evidence from the crime scene, and pursued a prosecution solely based on the false and wrongfully obtained statements.[4]

This Court did not issue a "directive" that plaintiff would have to prove these three points in order to prevail on the claim.  While the claim survived a motion for judgment on the pleadings, it cannot survive summary judgment where plaintiff's argument attempts to

---

[4]     Plaintiff states that he has not alleged a reckless investigation claim.

combine substantive due process theories (conscience shocking interrogation techniques) with malicious prosecution theories (defendants failed to investigate plaintiff's statements and prosecuted him based on a false confession) to establish one all-encompassing substantive due process claim.  Based on the law set forth above, while such a claim may be recognized in the Eighth Circuit, it is not permitted in this Circuit.  The Court agrees with defendants that plaintiff is improperly attempting to recast his malicious prosecution claim as a substantive due process claim when he argues that criminal proceedings were instituted against him based on false evidence or testimony.  Accordingly, there was no clearly established basis in 1992 (or at present) for the type of substantive due process claim that plaintiff now advances.[5]

Thus, the Court examines whether defendants, who have asserted qualified immunity, are entitled to judgment on the substantive due process violation based on the alleged coerced confession.[6]

---

[5] Defendants are entitled to qualified immunity unless the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right and that the right was clearly established at the time of the alleged violation.  *Tolan v. Cotton,* 134 S.Ct. 1861 (2014).

[6] In fact, in opposing the Motion for Judgment on the Pleadings as to the substantive due process claim, plaintiff argued that the claim survived because it had adequately plead conscience-shocking behavior in the interrogation of a man with severe mental illness. Plaintiff stated, "Rather than take care in interviewing him, Defendants exploited his vulnerability and coerced him into confessing by offering bribes, and using undue pressure and suggestion, including feeding him details of the crime.  As in [cases cited], that alone is sufficient to shock the conscience. But even if any doubt remained as to whether Defendants' conduct surpassed that threshold, the appropriate course is to allow discovery to proceed so that Mr. Tinney may present the 'totality of the facts' to this Court.  Mr. Tinney may bear a heavy burden in proving his contention that Defendants' conduct is conscience-shocking, but nothing in the law precludes the attempt." (Doc. 31 at 9)

16

Defendants argue that, while alleged in the Second Amended Complaint, the evidence shows that plaintiff's confession was not coerced given that: 1) Tinney's April 2 affidavit stated that he was willing to help the prosecutor's office of his "own free will" and had "not been threatened or pressured in any kind or way." 2) At his plea hearing, plaintiff denied any promises, pressure, or threats. 3) After his guilty plea, he wrote his mother-in-law a holiday card that stated, "P.S. tell Renee that I didn't kill that guy I just took the blame for it so I could spend the rest of my life in prison.  I didn't even know him I just made the story up so the prosecutor would believe me and it worked." 4) Tinney testified at deposition that "to the best of [his] knowledge," he told the truth when the judge asked him at his plea hearing whether anybody had threatened or promised him anything and he responded, "No."  5) Tinney said in a 2004 statement given to the Mansfield Police Department that there were no promises made in order to get his confession, and he confessed to the murder because his wife was talking about leaving him and he was not taking his medication so he would "just stay the rest of [his] life in prison."  (pltf. depo. Ex. Doc. 46) 6) Plaintiff's expert psychologist testified that plaintiff's confessions were voluntary false confessions. (Bressler depo. 44)

Nor, defendants assert, did the interview techniques shock the conscience.  Defendants note that plaintiff has alleged two bases of coercion- exploitation of his mental illness[7] and bribery.

---

[7]     Masi and Mesaros aver that they saw no indication at either interview that Tinney was mentally ill (Masi aff. ¶¶ 32,43; Mesaros aff. 18). Defendants also submit the expert opinion of James Karpawich who states that there is "insufficient information based on the statements and the records from that period that Mr. Tinney was suffering from symptoms of a severe and persistent mental illness when he confessed ..."  (Doc. 51 Ex. 8)

17

Plaintiff asserts that defendants' conduct did shock the conscience because Masi and Mesaros knew of plaintiff's mental illness and exploited it to get him to make a confession. Plaintiff points to Masi's notes which show that Griffith told him that Tinney was either in prison or the Massillon State Hospital. (Masi aff. Ex.) Masi knew the latter to be a psychiatric hospital. (Masi depo. 147-148) Plaintiff's expert opines that Tinney suffered from mental illness during the time of the two interviews which was well-documented in the prison records. (Doc. 57 Ex. 16) Plaintiff also points to the absurdity of the facts of plaintiff's confession, his reference to Satan, his demeanor, and other signs of mental illness at the time of his interviews. Additionally, plaintiff told his interrogators during the April 2 interview that he needed a glass of water because his medication dries him out and that on the day of the murder he was using a psychiatric medication.

Even if the Court assumes defendants knew plaintiff was mentally ill at the time of the interviews, knowledge of plaintiff's mental illness, alone, does not eviscerate the voluntariness of a confession. *Colorado v. Connelly,* 479 U.S. 157 (1986) Nor does it amount to conscious-shocking behavior. The knowledge is not sufficient to impute liability. Plaintiff asserts that defendants' conduct shocks the conscience because they exploited plaintiff's condition to get the confession. For the following reasons, the Court disagrees that there is evidence of such.

Plaintiff asserts that Masi "fed to him an account of the crime, including the location (at the waterbed store), nature of the attack (blows to the head), that money had been taken, as well as the false fact that Tinney was employed by White. (Doc. 57 at 19) Relying on *Bies v. Sheldon,* 775 F.3d 386 (6th Cir. 2014), plaintiff contends that such "fact-feeding," especially

18

where a suspect has diminished capacity, violates the Constitution and renders a confession involuntary. *Bies,* however, was a habeas case, not a substantive due process case, and is factually distinguishable. Petitioner's claim was that the trial court improperly allowed his custodial statements to be admitted at trial. The court recognized that the government's case against the petitioner "rested almost entirely upon an unrecorded statement that Bies allegedly made to the police following a prolonged and highly suggestive custodial interrogation." Petitioner had been medically diagnosed and judicially determined to be a person with intellectual disability, with an IQ in the 0.4th percentile. The court noted, "The Supreme Court has warned that defendants with intellectual disability are particularly prone to give false confessions."

As discussed earlier, the burden of establishing a Fourteenth Amendment substantive due process violation is higher than establishing a Fifth Amendment claim. Additionally, the evidence does not show that defendants "fed" plaintiff details of the crime. Masi testified at deposition that prior to the interview, he did not review the case file, he had not been involved in the 1988 investigation, and he knew nothing about the crime except that Ted White was killed inside a waterbed store. In fact, plaintiff acknowledges in his brief that "[d]espite the fact that this was a cold case, and that Tinney, who was in Lebanon on a burglary charge, was not going anywhere, Masi did not take the time to review the White case file before he went." (Doc. 57 at 6) Plaintiff points to Masi's notes of the first interview wherein he records that Tinney requested to know what Masi had heard and from what sources. Masi states, "At that point, I decided to disclose some of the pertinent information that I had received to Mr. Tinney including the arrest and conviction of Matt Mason for the Gursha Johnson homicide."

19

Plaintiff points to Masi's deposition testimony wherein he was asked what information he had disclosed and Masi responded, "I told him what I heard from the Crawfords." (Masi depo. 83) As set forth above, the Crawfords had told Masi that Tinney worked for White at the waterbed store, and that Tinney told them that Mason told Tinney that he snuck up behind White in the store while White was putting money in the deposit bag and hit him over the head with the butt of a gun, took the money, and fled the store. Thus, the facts that plaintiff claims were fed to him are the facts that plaintiff himself had relayed to the Crawfords.

Plaintiff also asserts that defendants' conduct shocks the conscience because defendants bribed him into confessing by offering money, help with a transfer, and a good word with the parole board. Plaintiff points to Masi's notes from the March 31 interview. Masi relates,

> I told Tinney that I was interested in the information that he had, however, I didn't want him to tell me anything else that would incriminate him. Tinney stated that he could help the prosecutor's office if we could help him as well.

> I told Tinney that I was in no position to make deals, however, I would take his requests back to the prosecutor. I further stated that the prosecutor would have to be reasonably sure that he had some knowledge of the crime. Tinney stated that he had enough knowledge of the crime to wrap it up. Tinney stated that he only wanted the $523.77 that was confiscated from him when he was arrested for the offenses he's now serving time for, transferred to MANCI and a good word to the parole board the next time he has a hearing.

> I then asked Tinney what information he wanted me to take back to the prosecutor.

(Masi aff. Ex. 1) Tinney then related the details set forth above.

The Court agrees with defendants that Masi's statement that he would take Tinney's requests back to the prosecutor does not amount to bribery. Under the less demanding criminal rules, the Sixth Circuit rejected a defendant's argument that his confession should

have been suppressed because it was obtained by police coercion given the officers' promise to inform the prosecutor of defendant's cooperation. *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (Defendant's "claim that the promise to make his cooperation known to the prosecutor amounted to coercion is unavailing.")

As for the April 2 interview, plaintiff points to Mesaros's statement that he would look into getting plaintiff's money back. Plaintiff refers to Mesaros's deposition testimony wherein he stated that plaintiff would have had a "tough time" getting the money back on his own. Mesaros also testified at deposition that he was told that plaintiff wanted to be able to smoke cigarettes and have coffee. Masi averred that during plaintiff's phone call to him following the first interview, plaintiff asked if he would be able to smoke cigarettes and drink coffee. Defendants arranged for plaintiff to be escorted to a special area of the Richland County Jail where he could smoke. During his June 17, 1992 interview with a newspaper reporter, plaintiff stated that Mesaros had made it clear to him that he would pull him out of his cell to smoke cigarettes, which he did.  (Doc. 57 Ex. 30) Plaintiff asserts that while the inducements may appear trivial, to plaintiff they were significant.

The Court agrees with defendants that this behavior was not conscience- shocking. In *Smith, supra,* the court rejected a juvenile's substantive due process claim based on a detective's interrogation techniques which resulted in a false confession to a murder. Recognizing that the Fourteenth Amendment standard is higher than the Fifth Amendment one, the court found that the detective used "classic interrogation techniques on a 17-year -old boy, one minute claiming to be his friend, the next minute suggesting he was a hardened criminal, but he had reason to be persistent" given an eyewitness identification of plaintiff as

21

a participant in the murder and plaintiff's statements consistent with his involvement. Referring to *Rochin v. California*, 342 U.S. 165 (1952), the court recognized the high burden in establishing a substantive due process claim and concluded that the detective's "actions are not shocking to the degree necessary to violate the right to substantive due process." In *Rochin,* for example, the Supreme Court found such a substantive due process violation where deputy sheriffs, having some information that the accused was selling narcotics, entered the open door of his house and forced open the bedroom door. They then forcibly attempted to extract capsules which he had swallowed. At the hospital, the sheriffs directed a physician to force an emetic solution through a tube into the accused's stomach against his will to produce vomiting.

Under the demanding substantive due process standard, plaintiff's claims that Masi fed him details of the crime and Masi and Mesaros bribed him during the interrogation simply do not amount to conscience-shocking behavior as was found in *Rochin*.

For these reasons, plaintiff's substantive due process claim fails.

**(2) procedural due process**

This Court previously found that plaintiff's allegation that defendants, "despite knowing the confessions were false," presented these confessions to a court as the basis to convict him of murder, stated a procedural due process claim as to Masi. Defendants assert that Masi is entitled to summary judgment because plaintiff received all the process due him when he entered his plea before the trial court, and Masi never presented plaintiff's confessions to the court.

"Procedural due process generally requires that the state provide a person with notice

22

and an opportunity to be heard before depriving that person of a property or liberty interest."
See, e.g., *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir.2001) "A guilty plea is
constitutionally valid if it is entered voluntarily and intelligently, as determined by the totality
of the circumstances." *Brady v. United States*, 397 U.S. 742 (1970); *Boykin v. Alabama*, 395
U.S. 238 (1969).

Defendants assert that plaintiff received all the process he was due in his criminal
case. Defendants submit the transcript of the plea hearing which shows that there was an
extensive colloquy by the judge and that plaintiff was represented by counsel who indicated
that he had spoken with plaintiff three times regarding his plea.  (Doc. 26 Ex. 1) Defendant
also points out that no court has found the process related to the plea to be improper, although
the plea had been challenged. Nor did Masi present plaintiff's confessions to the trial court.

Plaintiff contends that Masi knowingly presented false statements to the court when he
testified before the grand jury. Plaintiff asserts that the evidence shows that Masi knew
plaintiff's statements were false given that they were riddled with inaccuracies about the
known facts of the crime. Yet, Masi testified before the grand jury.  While there is no
transcript of the grand jury proceedings, plaintiff asserts that it can be assumed that Masi
testified before the grand jury about one or both of plaintiff's statements given that both Masi
and Mesaros have stated that plaintiff's statements formed the basis for his prosecution and
probable cause to indict.

Defendants maintain that plaintiff has not established a procedural due process claim.
This Court agrees.

Defendants assert that the procedural due process clause protects an accused from

23

being subjected to constitutionally deficient evidence *at trial.* Because plaintiff pled guilty and did not go to trial, he was not denied a fair trial and, consequently, procedural due process.

As the Sixth Circuit recognized in *Stumpf v. Robinson*, 722 F.3d 739 (6th Cir. 2013) (quoting *Lisenba v. California*, 314 U.S. 219 (1941)), "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." See *Medina v. California*, 505 U.S. 437, 443 (1992) (State action that deprives a defendant of a fundamentally fair trial violates the Due Process Clause's procedural component.) Thus, *Stumpf* noted the instances where such violations have been found to occur: where the state knowingly misrepresents evidence at trial, *Miller v. Pate*, 386 U.S. 1 (1967), presents false or misleading testimony at trial, *Mooney v. Holohan*, 294 U.S. 103 (1935), fails to correct false testimony at trial, *Napue v. Illinois*, 360 U.S. 264 (1959), or withholds materially exculpatory evidence so as to deprive defendant of a fair trial, *Brady v. Maryland*, 373 U.S. 83 (1963).

Because plaintiff was not denied a fair trial given that he entered a guilty plea, the procedural due process clause has not been implicated.  Even assuming it was, Masi avers that he was told that plaintiff had reached a plea agreement (Masi aff. ¶ 50) and that although he was present for the plea, he had no role in the plea hearing itself and never used or discussed the statements during the hearing.  (*Id.* ¶ 52) Plaintiff does not contradict this testimony or offer evidence that plaintiff's statements were "used" in a criminal proceeding, i.e., the plea

hearing. In particular, plaintiff does not dispute that the statements were not read into evidence or mentioned by the prosecutor at the plea hearing. Plaintiff only points out that the trial judge referred to plaintiff "giving a statement" and stated that "based upon that statement and what the state would be able to prove because of that statement is the reason that you're making your plea in this matter..." (Doc. 26-1) The judge did not opine on whether there was a factual basis for the plea. (*Id.*) On this basis, plaintiff does not show that the Court heard evidence regarding his confessions and that his statements were "used" at the plea hearing.

Summary judgment is warranted on the procedural due process claim.

### (3) Conspiracy

Having found no underlying constitutional claim, the conspiracy claim, alleging an agreement to violate plaintiff's constitutional rights, fails.

### (4) *Monell*

Likewise, plaintiff's municipal liability claim fails. *Robertson v. Lukas*, 753 F.3d 606 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

### (5) State law claims

Having found no constitutional violations, the state law claims of intentional infliction of emotional distress and conspiracy fail as well.

### (B) Defendant Masi's Supplemental Motion for Summary Judgment

Plaintiff alleges § 1983 Fourth Amendment and state law malicious prosecution claims against Masi. As plaintiff acknowledges, the federal and state claims require essentially the same showing.

25

As stated earlier, "The Sixth Circuit recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). [T]he tort of malicious prosecution... remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Id.* To succeed on the claim, plaintiff must prove the following: 1) a criminal prosecution was initiated against him, 2) defendant made, influenced, or participated in the decision to prosecute, 3) a lack of probable cause for the criminal prosecution, 4) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure, 5) the criminal proceeding was resolved in the plaintiff's favor. *Id.* (citations omitted).

Defendant argues that the prosecution was supported by probable cause; he did not make, participate, or influence the decision to prosecute; and he is absolutely immune for any grand jury testimony.

As defendant points out, an indictment by a grand jury conclusively determines the existence of probable cause. "As a general rule, the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause. However, an exception applies where the indictment was obtained wrongfully by defendant police officers who knowingly presented false testimony to the grand jury. This exception also covers officers who testify with a reckless disregard for the truth." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (citations omitted).

Defendant asserts that there is no evidence that he lied to the grand jury (or testified with reckless disregard to the truth) because there is no evidence of what occurred there. In

particular, there is no transcript of the grand jury proceedings and when questioned at his second deposition, defendant was unable to recall his grand jury testimony. Because plaintiff has produced no affirmative evidence that the grand jury received perjured testimony or that the proceedings were somehow irregular, he cannot meet his burden to overcome the evidence of probable cause afforded by the indictment.[8]

Plaintiff asserts that due to Masi's reckless disregard for the truth before the grand jury, there is an issue of fact as to probable cause. Masi testified at his supplemental deposition that he does not remember anything about his grand jury testimony. He believes he was the only witness to testify before the grand jury, but he cannot recall. Although he does not recall, typically the investigating officer's testimony, and not documentary evidence, would be the only evidence presented. (Doc. 71 Ex. 1) Plaintiff contends that affirmative evidence supports an inference that his testimony was so misleading that no jury would have indicted plaintiff. For the following reasons, the Court disagrees that plaintiff is entitled to such an inference.

First, plaintiff asserts that because Masi has testified that he did not know plaintiff was mentally ill, it must be assumed that he did not inform the grand jury that plaintiff was mentally ill when he made his statements. Due to the fact that mental illness is critical to assessing whether there was probable cause to believe a suspect committed an offense,

---

[8]  Alternatively, defendant argues that a reasonable officer could have reasonably believed that plaintiff's prosecution was supported by probable cause given that the first confession was plausible, he confessed again to prison personnel, and the second confession to defendants changed due to plaintiff's fear of Matt Mason. This Court agress.

defendant's failure to disclose the mental illness is misleading.

Second, plaintiff points to Masi's deposition testimony that although he cannot recall his testimony and he typically would have included both of plaintiff's statements, he could not state that he did. Because the Court must view all reasonable inferences in plaintiff's favor, he asserts, plaintiff is entitled to an inference that the grand jury only heard about plaintiff's first statement and not the second which contradicted the first and the facts of the case. [9]

Plaintiff has the burden of showing affirmative evidence that the grand jury was provided with false or reckless testimony in order to overcome the grand jury's conclusive finding of probable cause. Plaintiff has produced no evidence of what occurred in the grand jury. Plaintiff acknowledges that Masi cannot recall his testimony and that plaintiff is unable to present a transcript of the proceedings. Plaintiff speculates as to what he believes Masi may have testified to. The speculation is insufficient. *See also Snow v. Nelson,* - Fed.Appx.-, 2015 WL 8479623 (6th Cir. Dec. 10, 2015) ("Without a transcript of the grand jury proceedings, there is no evidence that defendant-appellees testified falsely or recklessly and, therefore, no evidence that undermines the presumption of probable cause created by the indictment.") The Court also finds the inferences to be unwarranted

Plaintiff asserts that Masi has stated that he did not know plaintiff was mentally ill

---

[9] As defendant points out, both of these "inferences" concern whether Masi failed to present exculpatory evidence to the grand jury. But, the Sixth Circuit has held that no such duty exists. *United States v. Adamo,* 742 F.2d 927 (6th Cir. 1984). Plaintiff cannot overcome the conclusive proof afforded to a grand jury indictment by alleging that the grand jury should have been told additional information.

and, therefore, he must not have testified that he was mentally ill. Masi did testify at deposition that he did not have any suspicion that plaintiff had mental illness.  (Masi depo. 72) Even if the Court assumes that Masi did not tell the grand jury about plaintiff's mental illness, plaintiff's argument that Masi recklessly disregarded the truth about the mental illness is not persuasive. Being told that plaintiff had been in a psychiatric hospital at some point and plaintiff's statement during his interview that he was on some form of psychiatric medication does not necessarily equate to mental illness. Further, plaintiff's statements made in the second interview are also consistent with plaintiff's stated fear of Mason.  This is insufficient evidence giving rise to reckless disregard for the truth.

Plaintiff also asserts that the Court may infer that Masi only presented plaintiff's first statement (of March 31), and not the second (of April 2), to the grand jury.  Such an inference is wholly unwarranted. Masi testified at his second deposition that although "I don't know for sure," he would typically have provided the grand jury with both statements.  Plaintiff cannot turn this testimony into an inference that Masi did not tell the grand jury about the second statement.  This is mere speculation. Additionally, plaintiff points to his expert's supplemental report. John Sammon's supplemental expert report states: "Masi said he does not recall if he mentioned both of the statements made by [plaintiff] at the Lebanon Correctional Institution on March 31, 1992, and April 1, 1992, although Masi assumes that he did." (Doc. 71 Ex. 2) Thus, even the expert acknowledges that Masi assumes he presented both statements.

For these reasons, plaintiff cannot overcome the conclusive proof of probable cause

provided by the grand jury indictment and the malicious prosecution claim fails.[10]

Assuming there was no probable cause, Masi asserts that he did not make, participate, or influence the decision to prosecute. Masi avers that he was not involved in the decision to seek the indictment.  (Masi aff. ¶ 47)  Mesaros avers that the decision to present a case against plaintiff to the grand jury was made by Mesaros and Mayer without Masi's  involvement. (Mesaros aff. ¶¶ 27-30)

Plaintiff asserts that Masi participated in the decision to prosecute him without probable cause by feeding plaintiff the information which led to his March 31 confession but then stating in his report, which the prosecutor relied on, that he only disclosed some of the pertinent information. Also, according to plaintiff's expert, Masi, who was present without the prosecutors, would have seen plaintiff's mental illness on display at the March 31 interview. Masi had other interactions with plaintiff after the initial interview and yet did not

---

[10]    Plaintiff also argues there is an issue of fact as to probable cause because Masi fed plaintiff the facts of the crime which resulted in the March 31 confession.  As discussed above, the evidence does not establish this.  In particular, the Crawfords told Masi that Tinney worked for White at the waterbed store.  Tinney told them that Mason told Tinney in 1988 that he snuck up behind White in the store while White was putting money in the deposit bag.  Mason said that he hit White over the head with the butt of a gun, took the money, and fled the store. Masi then interviewed plaintiff who asked what Masi had heard. Masi told plaintiff that Mason had been convicted of a different homicide and Masi told plaintiff what the Crawfords had told him.  (Masi aff. ¶ 26) Plaintiff acknowledges that Masi had not reviewed the case file prior to the first interview of plaintiff. Masi also avers that at that point, he "had not yet reviewed the Ted White homicide file." (*Id.*)

Defendant also points out that plaintiff has never argued, in attempting to withdraw his plea or otherwise, that Masi fed him the facts of the March 31 confession.  (Doc. 73 at 8) Additionally, defendant notes that plaintiff testified that he could recall nothing about his conversation with Masi on March 31. (pltf. depo. 39-40)

alert the prosecutor to the fact of plaintiff's mental illness which would have called into question his reliability. Finally, while Masi continued to review the file up to the indictment, he did not disclose to the prosecutors the inconsistencies between the initial confession and the facts of the crime.

Plaintiff's assertions are not persuasive. The evidence shows that Mesaros and Mayer made the decision to indict. Masi provided them with his entire investigation, including his reports. Mesaros avers that he reviewed the original murder investigation completed by the police. Mesaros was present for the April 2 interview of plaintiff. Thus, he could have observed plaintiff's behavior. Mesaros testified that he knew about the inconsistencies but still believed plaintiff was involved in the murder. Masi stated in his report of the March 31 interview that he disclosed some pertinent information to plaintiff. Because the prosecutors had the report, they could have questioned Masi about what information was provided.

On these grounds, plaintiff does not establish that Masi participated in the decision to prosecute based on his actions in misleading the prosecutors or failing to disclose pertinent information. The malicious prosecution claim would fail on this basis as well.

As a final argument, defendant asserts he is absolutely immune from this claim based on his grand jury testimony. In *Rehberg v. Paulk,* 132 S.Ct. 1497 (2012), the Supreme Court held that a grand jury witness, including a law enforcement officer, has absolute immunity from any § 1983 claim based on the witness's testimony even if the testimony is perjurious. The court stated:

> For these reasons, we conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony. In addition, as the Court of Appeals held, this rule may not be circumvented by claiming that a grand

jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves. ... In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.

*Id.* (internal citations, quotation marks, and alterations omitted) The court noted in a footnote that "we do not suggest that absolute immunity extends to all activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits... and fabricate evidence concerning an unsolved crime. *Id.* But, defendant points out that plaintiff's claim is premised upon Masi's grand jury testimony. Plaintiff asserts that his malicious prosecution claim is not based on Masi's grand jury testimony but on his failure to make a full and fair disclosure of all the material facts to the prosecutors. If the claim exists independently of the grand jury testimony, it is not "based on" that testimony and, therefore, *Rehberg* would not apply. *Coggins v. Buonora,* 776 F.3d 108 (2d Cir. 2015). Plaintiff asserts that his claim against Masi is based on conduct other than his grand jury testimony and so he is not entitled to absolute immunity. The Court disagrees.

As defendant points out, plaintiff is attempting to prove the lack of probable cause- an element of his malicious prosecution claim- by relying on Masi's grand jury testimony to show reckless disregard for the truth. Even though plaintiff claims these allegations are based on conduct which occurred before the appearance at the grand jury, plaintiff's attempt to prove this element with Masi's grand jury testimony shows that his claim is "based on" that

testimony.  Thus, there would be absolute immunity.  Plaintiff's allegations of evidence allegedly not presented to the grand jury (the mental illness and the April 2 statement) are based on grand jury testimony.  Plaintiff argues that if that evidence had been presented, the grand jury would not have indicted. Plaintiff cannot avoid immunity on this basis.

For all of these reasons, plaintiff's federal and state malicious prosecution claims against Masi fail and he is entitled to summary judgment.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment and defendant Joe Masi's Supplemental Motion for Summary Judgment are granted.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Dated: 2/2/16

33